UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATELYN M.,[1]

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

Case No. 2:23-cv-12276

Magistrate Judge Kimberly G. Altman

## <u>OPINION AND ORDER</u>
### <u>ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 13)</u>

I.      Introduction

This is a social security case.  Plaintiff Katelyn M. brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits (DIB) under the Social Security Act.  Both parties have filed motions for summary judgment.  (ECF Nos. 11, 13).  The parties have consented to the undersigned's jurisdiction including entry of a final judgment under 28 U.S.C. §

_____

[1] Consistent with guidance regarding privacy concerns in Social Security cases by the Judicial Conference Committee on Court Administration and Case Management, this district has adopted a policy to identify plaintiffs by only their first names and last initials.  *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

1

636(c).  (ECF No. 8).

For the reasons set forth below, Plaintiff's motion for summary judgment, (ECF No. 11), will be DENIED; the Commissioner's motion for summary judgment, (ECF No. 13), will be GRANTED; and the decision of the administrative law judge (ALJ) will be AFFIRMED.

## II.     Background

### A.     Procedural History

Plaintiff was 24 years old at the time of her alleged onset date of January 1, 2012.  (ECF No. 6-1, PageID.100).  She was considered a younger individual at the time of her alleged onset date.  *See* 20 C.F.R. § 404.1563.[2]  She completed two years of college (ECF No. 6-1, PageID.292).  She has past relevant work experience as a certified nursing assistant (CNA), sales staff, crew member, and information survey taker.  (*Id.*, PageID.113).  Plaintiff alleges disability due to anxiety, depression, arthritis, insomnia, PTSD, diverticulitis, anemia, ADD, eczema, auditory dyslexia, and unstable moods and suicidal thoughts in the recent past.  (*Id.*, PageID.100-101).

On February 6, 2017, Plaintiff filed an application for DIB.  (*Id.*, PageID.100).  Her application was initially denied on August 9, 2017.  (*Id.*,

[2] Under 20 C.F.R. § 404.1563(c), "if you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work."

2

PageID.139).  Plaintiff timely requested an administrative hearing, which was held before the ALJ on October 15, 2018.  (*Id.*, PageID.75).  On January 7, 2019, the ALJ issued a written decision finding that Plaintiff was not disabled.  (*Id.*, PageID.116-134).  On April 10, 2020, following Plaintiff's request for review, the Appeals Council entered an order remanding the matter back to the ALJ.  (*Id.*, PageID.135-137).  On remand, the Appeals Council directed the ALJ to

1)  Obtain additional evidence concerning the claimant's mental impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512). The additional evidence may include, if warranted and available, a consultative mental status examination and medical source opinions about what the claimant could do through March 31, 2018, the date last insured, despite the impairments.

2) Further evaluate the claimant's mental impairments in accordance with the special technique described in 20 CFR 404.1520(a), documenting the application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c).

3) Give further consideration to the claimant's maximum residual functional capacity and provided appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 & Social Security Rulings 85-16, 96-8p).

4) If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of assessed limitations on the claimant's occupational bas (Social Security Rulings 83-12, 83-14 & 85-15). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566). Further, before relying on

the vocational expert evidence [t]he Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(*Id.*, PageID.37-38).

On August 19, 2022, the ALJ held a new hearing. (*Id.*, PageID.58). Plaintiff testified at the hearing, as did a vocational expert (VE). (*Id.*). Plaintiff offered the following testimony.

Plaintiff stated that her ability to work is affected by stress from multiple sources, including being around strangers in crowds, loud noises, and screaming. (*Id.*, PageID.65). While she worked at McDonalds Plaintiff had trouble sleeping, which made it difficult to stay calm during the day in any environment. (*Id.*). The fast-paced environment was also difficult to handle, as were sudden changes in new procedures in the workplace. (*Id.*). She also stated that she often felt unsafe. (*Id.*).

Plaintiff explained that her mental health conditions had improved drastically since 2018, but she still had "a lot to go." (*Id.*, PageID.66). Plaintiff still had trouble paying attention and maintaining concentration, which may have gotten worse over time even though her emotional stability had improved. (*Id.*, PageID.66). At the time of the hearing, she still had trouble remembering what her daily tasks were, even if relatively simple. (*Id.*). She could not sit more than thirty

4

minutes without her legs going numb, and even while playing board games, she

usually had to get up and walk away for 15 to 20 minutes because she would be too

anxious to sit still.  (*Id.*).

On September 2, 2022, the ALJ issued a written decision finding that

Plaintiff was not disabled.  (*Id.*, PageID.34).  On July 21, 2023, the Appeals

Council denied Plaintiff's request for review, making the ALJ's decision the final

decision of the Commissioner.  (*Id.*, PageID.21).  Plaintiff timely filed for judicial

review of the final decision.  (ECF No. 1).

## B.    Medical Evidence[3]

### 1.    Physical

On February 26, 2016, Plaintiff had an appointment at McLaren Greater

Lansing Hospital, where Dr. Sarala Masti documented Plaintiff's diagnoses as

obesity, a fatty liver, obstructive sleep apnea, and splenomegaly.  (*Id.*,

PageID.583).  During a sleep study on March 31, 2016, Plaintiff was also

documented as having a mild periodic limb movement disorder.  (*Id.*, PageID.434).

Although it was recommended for Plaintiff to do a repeat sleep study, it does not

appear from the medical record that she did.  (*Id.*).

### 2.    Mental

---

[3] Plaintiff's brief discusses multiple conditions and medical records which post-date the Plaintiff's date last insured of March 31, 2018.  These are not part of the undersigned's analysis.

On February 23, 2013, Plaintiff called Community Mental Health of Clinton Eaton Ingham for suicidal ideation that had started the night before. (ECF No. 6-1, PageID.372-373). During her assessment, Plaintiff reported financial stress, feelings of dread and doom related to work, increased anger secondary to fear, and panic attacks about once a month. (*Id.*, PageID.372). She stated that she had difficulty breathing that morning and was hyperventilating, shaking, and spinning. (*Id.*). She had also experienced vomiting and urinary incontinence. (*Id.*). She further explained that she could not "control the littlest tasks," and was constantly stressed and worried, which led to thoughts of suicide. (*Id.*). Plaintiff was discharged that day with a recommendation to intensive therapy for a short period due to acute crisis as well as medication consultations for anxiety and depression. (*Id.*, PageID.373).

On February 27, 2013, Plaintiff was seen at Ingham Community Health Centers by Dr. Priti Pathak and a therapist. (*Id.*, PageID.407, 410). She described having anxious and fearful thoughts, depressed mood, difficulty concentrating, difficulty falling asleep, diminished interest and pleasure, excessive worry, fatigue, feelings of guilt, and thoughts of death. (*Id.*, PageID.407). She was diagnosed with depression and anxiety. (*Id.*, PageID.412). At a visit with the same therapist in March 2013, Plaintiff's reasoning was documented as "fair" and her impulse control, judgment, and insight were observed as "poor," but she denied suicidal

6

ideations and her mental status was otherwise normal. (*Id.*, PageID.405-406). At a therapy appointment in April 2013, Plaintiff's impulse control, judgment, and insight had improved to "fair." (*Id.*, PageID.398-399). On October 11, 2013, Dr. Pathak noted that Plaintiff's psychiatric exam was normal; she was oriented, had normal insight and judgment, and demonstrated the appropriate mood and affect. (*Id.*, PageID.396). At a visit with her therapist on October 14, 2013, Plaintiff was again noted as having poor reasoning, impulse control, judgment, and insight, although her mental status was otherwise normal. (*Id.*, PageID.392).

On July 16, 2014, Plaintiff was evaluated for ADHD by Dr. Louis Dvorkin. (*Id.*, PageID.842). He found that ADHD was unlikely, but otherwise noted Plaintiff's diagnoses as major depression, adjustment disorder with anxiety, and dependent personality disorder. (*Id.*, PageID.844). Plaintiff was also referred to a learning disorder remediation specialist for assessment to rule out dysphonetic dyslexia. (*Id.*).

On July 20, 2014, Plaintiff was hospitalized at Sparrow Hospital for suicidal ideation. (*Id.*, PageID.376). Plaintiff described feeling financial stress, as well as decreased concentration and appetite. (*Id.*). She had normal judgment, but impaired cognition and memory along with a depressed mood. (*Id.*, PageID.378). Plaintiff was transferred to Memorial Healthcare Center on July 21, 2014, where she stayed for three days. (*Id.*, PageID.384). At her discharge on July 24, 2014,

7

the provider noted that Plaintiff made excellent progress and was happy to go home. (*Id.*). She was otherwise noted to be alert, oriented, cooperative, attentive, and as having good insight, judgment, and impulse control. (*Id.*). Her diagnoses were documented as depression, borderline personality disorder, and obesity. (*Id.*).

On August 18, 2014, Plaintiff was seen at Mid-Michigan Behavioral Health for medication management, where she was noted as doing well. (*Id.*, PageID.515). She did not have suicidal thoughts, and was otherwise well-groomed and cooperative, with a euthymic mood and appropriate affect. (*Id.*, PageID.516). Her attention and memory were "fair," and her judgment and insight were "fine." (*Id.*).

On September 18, 2014, Plaintiff received a psychological assessment at Central Michigan University, where they concluded Plaintiff did not meet the criteria for a specific learning disorder. (*Id.*, PageID.418). Dr. Nathan Weed and Jacob Raak, a graduate clinician, recommended additional accommodations through student disability services at Plaintiff's school because her displayed weakness in fluent reading and phonics coupled with her depression and anxiety could make it difficult for her to read under time pressure. (*Id.*). They also suggested that she see a speech pathologist for her reading difficulties. (*Id.*).

Plaintiff was seen again at Mid-Michigan Behavioral Health for medication management on October 27, 2014. (*Id.*, PageID.514). At her appointment,

Plaintiff explained she was not doing well because of anxiety and poor sleep. (*Id.*).
She was reported as not having suicidal thoughts, and she was otherwise well-
groomed and cooperative, with an appropriate affect. (*Id.*). Her mood was
documented as anxious, but her attention and memory were "fair," and her
judgment and insight were "fine." (*Id.*). During a visit on November 21, 2014,
Plaintiff reported muscle tremors and panic attacks, as well as trouble sleeping and
anxiety. (*Id.*, PageID.513). She was again noted as having an anxious mood but
otherwise remained the same. (*Id.*).

Plaintiff continued to see her provider at Mid-Michigan Behavioral Health
for medication management through 2015. (*Id.*, PageID.505-512). Her attention
and memory were always noted as "fair," while her judgment and insight were
"fine." (*Id.*). She did not suffer from suicidal ideations during 2015. (*Id.*).
During her January appointment, Plaintiff explained that she was sleeping poorly
but that her anxiety was not high. (*Id.*, PageID.512). She was noted as
cooperative, with a well-groomed appearance, an appropriate affect, and an
anxious mood. (*Id.*). During her February appointment, she remained the same
aside from her appearance, which was noted as adequate. (*Id.*, PageID.511). On
March 11, 2015, she complained of poor sleep and feeling "very emotional." (*Id.*,
PageID.510). Her mood was again noted as anxious and her appearance as
adequate. (*Id.*). On March 20, 2015, she reported sleeping better but still not

great, and her mood was documented as euthymic.  (*Id.*, PageID.509).  She was seen again in July, where she reported sleeping poorly and lacking motivation. (*Id.*, PageID.508).  Her mood was noted as flat.  (*Id.*).  In October she again reported sleeping poorly.  (*Id.*, PageID.507).  Her mood was noted as both anxious and depressed and her affect was tearful.  (*Id.*).  On December 4, 2015, Plaintiff reported that "things were okay," but she was still not sleeping well and was more forgetful and having trouble focusing.  (*Id.*, PageID.506).  Her mood was still depressed and anxious, but her affect was documented as appropriate.  (*Id.*).  This remained the same at a visit on December 28, 2015, where Plaintiff reported that she was not feeling any better.  (*Id.*, PageID.505).

Plaintiff continued to attend medication management appointments through 2016.  (*Id.*, PageID.486-495).  Her judgment, insight, attention, and memory were always noted as either "fair" or "fine" and she did not report any suicidal ideations. (*Id.*).  In January 2016, Plaintiff reported having a panic attack and two other emotional episodes.  (*Id.*, PageID.495).  She explained that she felt helpless, hopeless, emotional, and angry at little things.  (*Id.*).  Her mood was noted as depressed and anxious, her affect as tearful, her behavior as cooperative, and her appearance as adequate.  (*Id.*).  This remained the same at her two appointments in February, except that her affect was noted as appropriate rather than tearful.  (*Id.*, PageID.493-94).  On February 16, 2016, Plaintiff also reported not sleeping well.

10

(*Id.*, PageID.493).  In May, Plaintiff again discussed her anxiety and insomnia.

(*Id.*, PageID.492).  She explained that she was unemployed, and would spend her

time laying around, helping her mom at church, and helping her sister who was an

EMT.  (*Id.*).  At that appointment, she was noted as having a depressed and

anxious mood, tearful affect, cooperative behavior, and adequate appearance.  (*Id.*).

She remained the same at an appointment on August 8, 2016, except that her mood

was noted as depressed.  (*Id.*, PageID.491).

      On August 22, 2016, Plaintiff reported headaches but a slightly improved

mood.  (*Id.*, PageID.490).  Her main concern was poor sleep.  (*Id.*).  Her

appearance was noted as well-groomed, her behavior was cooperative, her mood

was depressed, and her affect was constricted.  (*Id.*).  She remained the same at her

appointment on September 20, 2016, except that her mood was documented as

anxious, and she reported an increase in anxiety and loss of sleep.  (*Id.*,

PageID.489).  On September 27, 2016, Plaintiff reported that she was doing okay.

(*Id.*, PageID.488).  She reported that her headaches and sleep were better, but that

she still had anxiety.  (*Id.*).  Her appearance was documented as well-groomed, her

behavior was cooperative, her mood was euthymic, and her affect was constricted.

(*Id.*).  At her appointment in October, her affect had changed to appropriate, and

she reported an improvement in her anxiety.  (*Id.*, PageID.487).  On November 14,

2016, she was documented as having an anxious and euthymic mood, but her

appearance was well-groomed, her behavior was cooperative, and her affect was again appropriate.  (*Id.*, PageID.486).

Plaintiff reported to the emergency department at Sparrow Hospital on August 6, 2016, for suicidal ideations.  (*Id.*, PageID.473).  She explained that she had been feeling this way for five years and had been without relief for a year and a half.  (*Id.*).  She was tearful but consolable, alert, and oriented.  (*Id.*, PageID.475).  Her mood was anxious, but her judgment and insight were adequate. (*Id.*, PageID.482).  She was discharged the same day.  (*Id.*, PageID.483).

Plaintiff had two medication management appointments at Mid-Michigan Behavioral Health in 2017.  (*Id.*, PageID.485, 682).  On January 10, 2017, she reported poor sleep, but her mood was reported as euthymic, and all other observations remained consistent.  (*Id.*, PageID.485).  On March 14, 2017, her mood was reported as depressed, her affect was tearful, her appearance was adequate, and her behavior was cooperative.  (*Id.*, PageID.682).

In May 2017, Plaintiff's therapist Jennifer Ogle, LMSW (Ogle) wrote a letter summarizing Plaintiff's treatment.  (*Id.*, PageID.535).  Ogle explained that Plaintiff had been seeing her since November 15, 2013, and she had diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder with full-blown panic attacks.  (*Id.*).  Although Plaintiff had anxiety "all the time," Ogle explained that it was "increased and more significant" around other people.  (*Id.*).

12

She also stated that starting at the end of 2013, Plaintiff had been trying different medications to address her anxiety but had to change medications often. (*Id.*, PageID.536). Plaintiff had at least one hospital visit for suicidal ideation, but there were several other crises where Plaintiff contacted Ogle and the need for hospital or emergency services was mitigated. (*Id.*).

Ogle further stated that during the fall of 2014, Plaintiff's depression worsened and her ability to function "deteriorated significantly." (*Id.*). Plaintiff felt defeated with attempting to find the right medication, so she switched to using essential oils to manage her symptoms from March 2015 through September 2016. (*Id.*). Ogle explained that although Plaintiff resumed medications after this, they were still not effective in addressing all of Plaintiff's symptoms. (*Id.*, PageID.536-37). She also explained that Plaintiff's symptoms were exacerbated by stress, but that Plaintiff was able to use coping skills to get them back under control. (*Id.*, PageID.537).

Overall, Ogle stated that Plaintiff was highly engaged and motivated in therapy and was able to use skills learned in therapy outside of treatment to manage her symptoms. (*Id.*). At times, however, Ogle explained that it was difficult for Plaintiff to maintain functioning. (*Id.*). When Plaintiff started to attend school from 2013 to 2014, her mood was significantly decreased because of the stress and demand despite accommodations. (*Id.*). Ms. Ogle explained that

Plaintiff was unemployed throughout this period to focus on her mental health. (*Id.*).

Plaintiff had a medication management appointment at Mid-Michigan Behavioral Health on January 30, 2018. (*Id.*, PageID.681). She reported that she was not sleeping well, had headaches and no motivation, and was easily irritated. (*Id.*). Her mood was documented as depressed and anxious, while her affect was appropriate, tearful, and constricted. (*Id.*). Her insight and judgment were documented as fine, as were her attention and memory. (*Id.*). This was the final appointment before March 31, 2018, her date last insured.

III.    Framework for Disability Determination (the Five Steps)

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or

14

combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff was not disabled under the Act. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 1,

15

2012.  (ECF No. 6-1, PageID.40).  At Step Two, the ALJ found that Plaintiff had severe impairments of borderline personality disorder, generalized anxiety disorder, major depressive disorder, and obesity.  (*Id.*).  At Step Three, the ALJ found that none of Plaintiff's impairments met or medically equaled a listed impairment.  (*Id.*, PageID.42).

The ALJ then assessed Plaintiff's residual functional capacity (RFC) and concluded that she was capable of performing light work, except that she

> can lift and carry twenty pounds occasionally and ten pounds frequently; and push and pull as much as she can lift and carry. [Plaintiff] can sit for six hours, stand for six hours, and walk for six hours in an eight-hour workday.  [Plaintiff] can occasionally interact with co-workers and the public.  [Plaintiff] can perform "low stress" work, defined as work that is not complex, is not performed at a production rate pace, requires only routine changes in tasks or demands, and requires no greater than moderate or quiet noise intensity levels.

(*Id.*, PageID.44).

At Step Four, the ALJ found that Plaintiff had no past relevant work.  (*Id.*, PageID.49).  At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Plaintiff was capable of performing the jobs of routing clerk (60,000 jobs nationally), cleaner & polisher (42,000 jobs nationally), and marker (133,000 jobs nationally).  (*Id.*, PageID.50).  As a result, the ALJ concluded that Plaintiff was not disabled under the Act.  (*Id.*, PageID.51).

IV.    Standard of Review

16

A district court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although a court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224-225 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence."  42 U.S.C. § 405(g).  The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

In making "substantial evidence" the relevant standard, the law preserves the

17

judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) (" 'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.' " (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal quotation marks and citation omitted). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

18

651 (6th Cir. 2009) (internal quotation marks and citations omitted).

## V.    Analysis

Plaintiff argues that the ALJ improperly weighed the opinion of the consultative examiner, Dr. Michael Brady (Dr. Brady), affording it too little weight.  Additionally, Plaintiff argues that the ALJ erroneously denied Plaintiff's request to either subpoena or send interrogatories to Dr. Brady.  Each argument will be addressed in turn.

### A.    Opinion Evidence

#### 1.    Legal Standard

When evaluating a medical opinion, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record."  20 C.F.R. § 404.1520c(b).  The ALJ evaluates the persuasiveness of the medical opinions and prior administrative medical findings by utilizing the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors.  § 404.1520c(c).

Supportability and consistency are the most important factors and the ALJ must explain how he considered these factors in his decision.  § 404.1520c(b)(2).  Supportability means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her

19

medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." § 404.1520c(c)(1).  Consistency means "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." § 404.1520c(c)(2). Further, the ALJ is required to provide a "sufficiently detailed articulation of application of those factors in which the ALJ must show their work, i.e., to explain in detail how the factors actually were applied to each medical source." *Huizar v. Comm'r of Soc. Sec.*, 610 F. Supp. 1010, 1020 (E.D. Mich. 2022) (cleaned up).  In other words, the regulations "require that the ALJ provide a coherent explanation of his reasoning." *Lester v. Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021).

## 2.    Dr. Brady's Opinion

Dr. Brady evaluated Plaintiff on July 14, 2017.  (ECF No. 6-1, PageID.540). He found that Plaintiff's ability to relate to and interact with others was impaired due to maladaptive personality disorder, depression, and distress.  (*Id.*, PageID.543).  He noted that Plaintiff's ability to maintain concentration was somewhat impaired, and that because of her emotional state, she might often be

20

distracted and have limited effectiveness and performance. (*Id.*). He also noted that her ability to withstand normal workplace stressors was somewhat impaired. (*Id.*). He found no significant impairment to her ability to understand, recall, and complete tasks and expectations. (*Id.*).

### 3. ALJ's Evaluation of Dr. Brady's Opinion

The ALJ accorded little weight to Dr. Brady's opinion, explaining that his findings were "internally inconsistent and inconsistent with the totality of the medical evidence." (*Id.*, PageID.47-48). Specifically, the ALJ stated that

> Dr. Brady's findings are inconsistent with the relatively normal mental status examination findings during this period, noting the claimant's overall appearance and dress, affect, behavior, judgment, impulse control, insight, orientation, mood, and recent and remote memory skills and speech were adequate, appropriate, intact, or within normal limits. Moreover, in terms of the claimant's ability to perform basic mental work activities, I note that Dr. Brady's statement used vague, programmatic terms, e.g., "somewhat impaired" in articulating the claimant's mental functional limitations rather than providing specific descriptions about her abilities and mental functional limitations in these respective areas. Furthermore, I note that Dr. Brady's statements were based on a single examination of the claimant and were rendered without consideration and/or review of the claimant's full psychiatric treatment history and the complete medical record. Accordingly, I find the objective findings set forth above and the claimant's testimony discussed herein supports including the more specific mental limitations, as adopted in the above residual functional capacity.

(*Id.*, PageID.48 (internal record citations omitted)).

### 4. Discussion

Plaintiff argues that the ALJ improperly discounted the weight of Dr.

Brady's opinion based on the ALJ's own medical conclusions and without any

contrary evidence from another specialist.  (ECF No. 11, PageID.1461).  Plaintiff

explains that Dr. Brady's opinion that her ability to relate and interact with others

is impaired, combined with testimony from the VE that individuals must be able to

work with others, proves that competitive employment is precluded by Plaintiff's

disability.  (*Id.*, PageID.1460).

Contrary to Plaintiff's assertions, the ALJ properly accounted for the

supportability and consistency of Dr. Brady's opinion as required by §

404.1520c(b)(2) and found that his opinion was not persuasive.  Discussing

consistency, the ALJ explained that Dr. Brady's findings were inconsistent with

the relatively normal mental status examinations in Plaintiff's medical record

during the relevant period, as well as Dr. Brady's own mental status examination.

(ECF No. 6-1, PageID.48).  This assessment is supported by substantial evidence.

As evidence of Plaintiff's normal mental status examinations, the ALJ cited

to the following records.  (*Id.*).  During her visits at Ingham Community Health

Centers in 2013, although Plaintiff was noted as having fair reasoning and poor

control, judgment, and insight in March, by April all assessments had improved to

"fair" and by October they were normal.  (*Id.*, PageID.389-412).  On July 21, 2014,

Plaintiff was hospitalized at Memorial Healthcare Center for suicidal ideation, but

after a four-day stay, she was discharged and noted to be alert, oriented,

22

cooperative, attentive, and as having good insight, judgment, and impulse control. (*Id.*, PageID.384).  When Plaintiff was seen at Sparrow Hospital for abdominal pain on March 10, 2016, she was described as having a normal mood and affect, as well as normal behavior.  (*Id.*, PageID.428).  When Plaintiff reported to Sparrow again on August 6, 2016, for suicidal ideations, she was documented as tearful and anxious, but otherwise alert and oriented with adequate judgment and insight.  (*Id.*, PageID.473-483).  Throughout Plaintiff's medication management appointments at Mid-Michigan Behavioral Health from 2014 to 2017, she was often noted as cooperative and well-groomed, with an appropriate affect, and either "fair" or "fine" attention, memory, judgment, and insight, although her mood ranged from euthymic to anxious and depressed.  (*Id.*, PageID.485-516, 682).  When Plaintiff was again seen at Sparrow Hospital for abdominal pain on January 18, 2017, her mood, affect, behavior, judgment, and thought content were documented as normal.  (*Id.*, PageID.522).  The ALJ also noted that Dr. Brady's conclusions were inconsistent with some of his own findings during Plaintiff's mental examination, which were relatively normal.  (*Id.*, PageID.47-48).

Plaintiff argues that the ALJ should not have relied on these portions of her medical record because they are often "defaulted into medical records by non-answers" of physicians.  (ECF No. 11, PageID.1461).  However, Plaintiff cites no authority for the proposition that the ALJ must ignore portions of a medical record

23

merely because the answers are inserted by default during an examination.  The

objective medical evidence, including relatively normal mental status

examinations, is an acceptable factor to consider in evaluating opinion evidence of

mental limitations.  *See, e.g., Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220,

224 (6th Cir. 2019) (finding that in assessing medical opinion evidence the ALJ

did not err by relying in part on "largely normal" mental status examinations);

*Mason v. Comm'r of Soc. Sec.*, No. 17-2407, 2018 WL 6133750, at *1 (6th Cir.

Apr. 30, 2018) (finding that "relatively normal" mental status examinations, among

other considerations, were a proper basis to discount the treating psychiatrist's

opinion); *Francis v. Saul*, 558 F. Supp. 3d 527, 537 (E.D. Mich. 2021) ("The

ALJ's rationale for rejecting the treating opinion includes Dr. Silwanowicz's own

observations of good concentration, a cooperative attitude, good memory, and full

orientation.")  Overall, the ALJ properly assessed the consistency of Dr. Brady's

opinion and accorded it little weight based on substantial evidence of inconsistency

within Plaintiff's medical record.

    For supportability, the ALJ explained that Dr. Brady's statements were

based on a single examination of Plaintiff, and in formulating his opinion, Dr.

Brady did not review Plaintiff's treatment history or medical record.  (ECF No. 6-

1, PageID.48).  Further, "Dr. Brady's statement used vague, programmatic terms,

e.g., 'somewhat impaired' in articulating [Plaintiff's] mental functional limitations

rather than providing specific descriptions about her abilities and mental functional limitations in these respective areas." (*Id.*). The ALJ also noted that Dr. Brady found no significant impairment in Plaintiff's abilities to understand, recall, and complete tasks. (*Id.*, PageID.47). This analysis sufficiently explained the supportability of Dr. Brady's opinion.

Dr. Brady examined Plaintiff one time on July 14, 2017, and his conclusions were based solely on his observations from that examination. (*Id.*, PageID.540-43). Meanwhile, as discussed above, other providers who had seen Plaintiff on multiple occasions throughout the relevant period documented relatively normal mental status examinations. Additionally, an ALJ can properly discount the weight of an expert opinion when it is too vague and does not support specific functional limitations. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018); *Gaskin v. Commissioner of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008). Overall, there is substantial evidence to support the ALJ's conclusion that Dr. Brady's opinion was not supported by the medical record.

As for Plaintiff's assertion that the ALJ based his decision on his own medical conclusions without any contradictory evidence from another specialist, the Sixth Circuit has held that the residual functional capacity can be supported by substantial evidence without "a physician offer[ing] an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401-2

(6th Cir. 2018).  Ultimately, it is the responsibility of the ALJ to determine the residual functional capacity based on his "evaluation of the medical and non-medical evidence."  *Rudd v. Comm'r of Soc. Sec.*, 531 Fed. App'x. 719, 728 (6th Cir. 2013).  The fact that the ALJ accorded little weight to Dr. Brady's opinion does not mean that he interpreted the medical record and came to his own medical conclusions.

Instead, the ALJ properly weighed the opinion evidence of multiple providers to determine the severity of Plaintiff's impairments.  For example, the State Agency psychological consultant, Dr. Leonard C. Balunas, Ph.D. (Dr. Balunas), found that Plaintiff had only a mild limitation in her ability to interact with others and could respond appropriately to supervision, coworkers, and work situations.  (ECF No. 6-1, PageID.107, 112).  When weighing this evidence, the ALJ struck a balance between the opinions of Dr. Balunas and Dr. Brady, explaining that he accorded "only partial weight to [Dr. Balunas'] determination, as the evidence received at hearing level demonstrates [Plaintiff] would be further limited due to her anxiety and depression symptoms." (*Id.*, PageID.49).  The ALJ balanced the available opinion evidence from multiple providers in analyzing Plaintiff's residual functional capacity, ultimately concluding that Plaintiff was not disabled.

Plaintiff might wish "the ALJ had interpreted the evidence differently,"

*Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7

(S.D. Ohio May 20, 2016), *report and recommendation adopted*, 2016 WL

4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017), but

the law prohibits the Court from re-weighing the evidence and substituting its

judgment for the ALJ's.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411,

414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244,

246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does

not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide

questions of credibility, or substitute its judgment for that of the ALJ.")).  Because

the ALJ properly evaluated and discussed the supportability and consistency of Dr.

Brady's opinion, the ALJ satisfied the requirements of the regulations.  *See* 20

C.F.R. § 404.1520c(b)(2).

## B.     Medical Interrogatories

Next, Plaintiff argues that the ALJ erroneously denied her request to

subpoena Dr. Brady to testify at the hearing or, alternatively, to send him

interrogatories.  As support for her argument, Plaintiff cites 20 C.F.R. §

416.1450(d)(1), which provides:

> When it is reasonably necessary for the full presentation of a case, an
> administrative law judge or a member of the Appeals Council may, on
> his or her own initiative or at the request of a party, issue subpoenas for
> the appearance and testimony of witnesses and for the production of

books, records, correspondence, papers, or other documents that are material to an issue at the hearing.

The ALJ denied the request because sending interrogatories to the consultative examination doctor "is not normally done," and the record was otherwise sufficient for a determination.  (ECF No. 6-1, PageID.38).

As a preliminary matter, in her brief Plaintiff cites to her original request to subpoena Dr. Brady, or alternatively, to send him interrogatories, which was sent to the ALJ on August 15, 2018, ahead of Plaintiff's first hearing.  (ECF No. 11, PageID.1465).  There is no indication that Plaintiff renewed the request to subpoena Dr. Brady ahead of her second hearing nearly four years later on August 19, 2022.  Instead, during the second hearing, Plaintiff renewed only her request to send interrogatories to Dr. Brady.  (ECF No. 6-1, PageID.62).  Therefore, only Plaintiff's request to send interrogatories will be considered.

Plaintiff's proposed interrogatories would have asked Dr. Brady whether any other diagnoses would apply to Plaintiff's symptoms; whether her ability to complete a work day, maintain attention, concentrate, perform on a schedule, and be punctual were significantly impaired; whether she would have difficulty working forty hours a week without more than two absences a month; and whether there was a reasonable likelihood of "any decompensation of mental condition by requiring [Plaintiff] to participate in full time employment."  (*Id.*, PageID.338).

The Sixth Circuit addressed a nearly identical issue raised by the same

28

counsel in *Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393 (6th Cir. 2016). In that case, the Sixth Circuit held that the ALJ did not err in failing to grant the plaintiff's request to either subpoena or send interrogatories to the consultative psychologist. *Id*. at 404-5. Similar to this case, the consultative psychologist had stated in his report that the plaintiff "would have considerable difficulty working in any environment where she had to have interactions with others." *Id.* at 395.

Discussing the ALJ's failure to subpoena the consultative psychologist for testimony, the *Luukkonen* court stated two reasons that the ALJ did not abuse his discretion, both of which apply to the denial of Plaintiff's request for interrogatories in this case. First, in *Luukkonen*, the ALJ did not rely on information contained in the consultative psychologist's report when denying the plaintiff's claim. *Id.* at 404. As such, the plaintiff did not need to cross-examine the consultative psychologist on any harmful statements but was instead merely seeking to bolster her case. *Id.* Second, the information the plaintiff sought could have been proven without issuing a subpoena to the consultative psychologist specifically. *Id.* at 405. The plaintiff's request to subpoena the psychologist was based on his " 'failure to provide specific assessments relative to the functioning of' " the plaintiff. *Id.* The court explained that this information could have been sought from any of the plaintiff's own doctors or other experts, and it did not need to specifically come from the consultative psychologist. *Id.*

29

Here, similar to *Luukkonen*, the ALJ did not rely on any statements made by Dr. Brady in denying Plaintiff's claim.  Plaintiff was not requesting clarification of Dr. Brady's opinion or seeking to question him on an unfavorable opinion. Instead, she was seeking information to bolster her case.  Further, based on her proposed interrogatories, she was seeking information on her potential diagnoses and abilities, which she could have sought from any of her doctors or an expert of her choosing.

Ultimately, it is the ALJ who "has discretion to determine whether additional evidence is necessary." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010).  The ALJ accorded little weight to Dr. Brady's opinion in large part because his opinion was inconsistent with Plaintiff's medical record, including Dr. Brady's own mental status examination, and because Dr. Brady only examined Plaintiff once and wrote his report without reviewing her medical record. Additional evidence from Dr. Brady would not have changed the consistency and supportability of his opinion.  Even if Plaintiff had been allowed to send Dr. Brady interrogatories, his answers still would have been based solely on that one examination, and the conclusions in his report would still be inconsistent with Plaintiff's medical record.  As such, his answers would also have been accorded little weight in the ALJ's determination.  Therefore, the ALJ did not err in denying Plaintiff's request to send Dr. Brady interrogatories because Plaintiff's record was

sufficiently developed to allow the ALJ to make a determination, and additional evidence from Dr. Brady, as with his original opinion, would have been outweighed by Plaintiff's larger medical record.

## VI.   Conclusion

In conclusion, although Plaintiff suffers from impairments that affect her daily living, the ALJ found that her impairments do not rise to the level of precluding her from performing work consistent with the RFC.  Substantial evidence supports the Commissioner's decision that Plaintiff is not disabled within the meaning of the Act.

Accordingly, for the reasons stated above, Plaintiff's motion for summary judgment, (ECF No. 11), is DENIED; the Commissioner's motion for summary judgment, (ECF No. 13), is GRANTED; and decision of the ALJ is AFFIRMED.

SO ORDERED.

Dated: September 9, 2024                         s/Kimberly G. Altman
Detroit, Michigan                               KIMBERLY G. ALTMAN
                                                United States Magistrate Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 9, 2024.

                                                s/Carolyn Ciesla
                                                CAROLYN CIESLA

Case Manager